**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE, ) | Case: 1:23−cv−01782 |
| ) | Assigned To : Unassigned |
| Plaintiff, ) | Assign. Date : 6/20/2023 |
| ) | Description: Pro Se Gen. Civ. (F−DECK) |
| v. ) | Civil Action No._____ |
| ) | |
| THE FEDERAL REPUBLIC OF GERMANY ) | |
| 4645 Reservoir Rd. NW ) | |
| Washington, D.C. 20007, ) | |
| ) | |
| THE BUNDESKRIMINALAMT OF THE ) | |
| FEDERAL REPUBLIC OF GERMANY ) | |
| 4645 Reservoir Rd. NW ) | |
| Washington, D.C. 20007, ) | |
| ) | |
| Defendants. ) | |

**COMPLAINT**
**(Breach of Contract,**
**Violation of the Implied Covenant of Good Faith and Fair Dealing)**

**INTRODUCTION**

1.      The Panama Papers is perhaps the most influential leak of information exposing financial fraud and abuse in modern history.

2.      On April 3, 2021, the International Consortium of Investigative Journalists ("ICIJ"), the organization that coordinated a massive investigation of the information in the Panama Papers, wrote:

> Five years ago today, the International Consortium of Investigative Journalists and more than 100 media partners around the globe began publishing an investigation that would become a byword for exposing financial chicanery and political corruption: The Panama Papers.

> Citizens hit the streets in protest. They threw bananas and yogurt in Iceland and rocks in Pakistan. Governments fell. Authorities launched hundreds of tax probes and criminal investigations.

1

RECEIVED

JUN 20 2023

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

"This is an earthquake," CNN columnist Frida Ghitis said at the time. "The aftershocks will continue for months, even years to come."

She was right.

Half a decade later, the Panama Papers' revelations about how the offshore financial system enables greed and treachery continue to roil political and economic systems worldwide.[1]

3.      Plaintiff is the original source of the Panama Papers.

4.      The Federal Republic of Germany ("the German government") purchased the Panama Papers from Plaintiff to identify tax fraud and other financial offenses committed by German companies and individuals, and to collect funds due to the German government and its allies.

5.      Federal and state authorities in Germany have collected over $195 million in taxes and penalties as a result of the Panama Papers.

6.      In return for the Panama Papers, the German government through its federal criminal police agency, the Bundeskriminalamt ("BKA"), agreed to pay Plaintiff €5 million plus 10% of any recoveries resulting from the Panama Papers (including taxes due and owing, tax penalties, interest on taxes due and owing, criminal fines, and collections derived from other fiscal offenses) over and above €50 million as long as there was a "a causal relationship between the documents and the confiscation."

7.      The German government, through the BKA, paid Plaintiff €5 million post-tax[2] after delivering the Panama Papers to the BKA.

---

[1] *Five years later, Panama Papers still having a big impact*, International Consortium of Investigative Journalists (Apr. 3, 2021), https://www.icij.org/investigations/panama-papers/.

[2] Plaintiff and the BKA agreed early on that all negotiated amounts would be post-tax. The BKA obtained a German tax identification number for Plaintiff and automatically deducted and paid taxes from payments made to Plaintiff on Plaintiff's behalf. Despite multiple requests to the BKA, Plaintiff was never given a written record of the amount of tax due or paid.

8.      In breach of its contract with Plaintiff, however, the German government and the BKA have refused to pay any additional money to Plaintiff. That is to say that even though German authorities have collected over $195 million in taxes and penalties as a result of the Panama Papers, and even though the German government owes Plaintiff 10% of the amount exceeding €50 million (roughly equal to, at least, $14,565,000), it has paid Plaintiff nothing of that amount.

9.      The German government, through the BKA, has, at different times, misled, obfuscated, threatened, and refused to engage in response to attempts by Plaintiff to convince the government, without involving any courts, to honor its contract.

10.     This behavior is consistent with the games the German government, through the BKA, played with Plaintiff during the months it took to negotiate the sale of the Panama Papers—having Plaintiff negotiate with the same agents assigned to protect Plaintiff; refusing to memorialize agreements in writing (before providing an unsigned agreement); delaying access to payments; attempting to physically intimidate Plaintiff; actually placing Plaintiff in physical danger; and disingenuously blaming bureaucracy for delay and bad faith dealing. This was the BKA's unprofessional and shameful approach for approximately five months of unnecessarily protracted negotiations conducted while Plaintiff was in Germany under the protective care of the BKA.

11.     Then, and now, the BKA has taken advantage of the serious threat posed to Plaintiff's life by numerous powerful and corrupt businessmen and politicians, including but not limited to Russian President Vladimir Putin, whose financial secrets Plaintiff exposed both at the time of initial publication and subsequently through the follow-on work of jailed Russian dissident Alexei Navalny.  In January 2021, Navalny's team released a two-hour documentary

exposé of Putin's secret billion-dollar palace near Gelendzhik, directly referencing the Panama Papers.  *See* https://www.youtube.com/watch?v=ipAnwilMncI.

12.    Indeed, in 2017, the Russian government-controlled news channel, Russia Today ("RT"), aired a two-part Panama Papers docudrama featuring a "John Doe" character who suffered a torture-induced head injury during the opening credits, after which a cartoon boat sailed through the pool of John Doe's blood as though it were the Panama Canal, as shown below:

 

13.    Under Putin's leadership, the Russian Federation has since launched a genocidal invasion of Ukraine that threatens all of Europe and by extension, the United States. Germany is a key NATO ally in the effort to repel Russia's invasion, and the Panama Papers contain a great deal of information about Russia's use of the offshore system, which is key to its military, especially given U.S. Treasury sanctions. Furthermore, Plaintiff has offered the BKA additional information beyond the Panama Papers. Yet instead of treating Plaintiff with respect, the German government, through the BKA, has toyed with them, played on their fears, and, ultimately, turned its back on them, rebuffing Plaintiff's offers and effectively daring them to take legal action that might very well compromise their anonymity and, therefore, their safety.

14.     Accordingly, Plaintiff files this Complaint under a pseudonym to protect their safety while pursuing their rights. This Complaint also uses the plural they/them to refer to Plaintiff as not to reveal Plaintiff's gender.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this case pursuant to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330, 1605(a)(1) and/or 1605(a)(2). Pursuant to the FSIA, if the Court has subject-matter jurisdiction, it also has personal jurisdiction over the foreign sovereign defendants.

16.     Venue is proper in United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(f)(4).

## PARTIES

17.     At all times relevant to this Complaint, Plaintiff was a citizen of the United States. John Doe is a pseudonym used by Plaintiff. Contemporaneously with the filing of this Complaint, to protect their safety, Plaintiff has filed an *ex parte* Motion for Leave to Proceed Under a Pseudonym in this matter, as well as an *ex parte* Motion for Alternative Service.

18.     At all times relevant to this Complaint, Defendant Federal Republic of Germany was a foreign state, as defined under the FSIA, 28 U.S.C. § 1603(a), with its capital in Berlin, Germany, and actual presence in the United States at 4645 Reservoir Rd. NW, Washington, D.C. 20007.

19.     At all times relevant to this Complaint, Defendant BKA was an agency and instrumentality of Defendant Federal Republic of Germany, as defined under the FSIA, 28 U.S.C. § 1603(b).

## FACTS

### I.    The Panama Papers

20.    In early 2015, Plaintiff contacted journalist Bastian Obermayer of the German newspaper *Süddeutsche Zeitung* and began the process of transferring to Obermayer and his colleague Frederik Obermaier what would become known as the Panama Papers.[3]

21.    To analyze the massive amount of data in the Panama Papers (by the project's completion, approximately 3.26 terabytes worth of information stored in 13 million files), *Süddeutsche Zeitung* collaborated with the ICIJ, an organization that facilitates collaboration between investigative journalists worldwide.  The ICIJ coordinated with over 370 journalists from 76 countries to publish stories synthesizing the data in the Panama Papers.  For these efforts, the Center for Public Integrity, ICIJ's then-parent organization, was awarded the 2017 Pulitzer Prize in the category of explanatory reporting.

22.    On April 3, 2016, when the ICIJ and its cooperating journalists began releasing stories on the Panama Papers, the ICIJ described the Panama Papers as a "cache of 11.5 million records show[ing] how a global industry of law firms and big banks sells financial secrecy to politicians, fraudsters and drug traffickers as well as billionaires, celebrities and sports stars."[4]

23.    Importantly, in accordance with its own policy, the ICIJ and its partners did not publish the Panama Papers themselves, only stories and analysis derived from the Panama Papers.

---

[3] BASTIAN OBERMAYER & FREDERIK OBERMAIER, THE PANAMA PAPERS: BREAKING THE STORY OF HOW THE RICH & POWERFUL HIDE THEIR MONEY (June 30, 2016).

[4] *Giant Leak of Offshore Financial Records Exposes Global Array of Crime and Corruption*, International Consortium of Journalists (Apr. 3, 2016),
https://www.icij.org/investigations/panama-papers/20160403-panama-papers-global-overview/.

24.     The leaked records came from Mossack Fonseca, a law firm based in Panama with branches in Hong Kong, Miami, Zurich, and more than 35 other places around the globe.[5] Jürgen Mossack, one of the firm's two named partners, was the son of a Nazi SS officer who escaped justice in Germany after World War II by emigrating to Panama. The ICIJ surmised that "[t]he law firm's leaked internal files contain information on 214,488 offshore entities connected to people in more than 200 countries and territories."[6] The ICIJ, in its initial article on the subject, highlighted that the Panama Papers:

a.     "reveal[ed] how associates of Russian President Vladimir Putin secretly shuffled as much as $2 billion through banks and shadow companies;"

b.     "expose[d] offshore companies controlled by the prime minister of Iceland, the king of Saudi Arabia and the children of the president of Azerbaijan and the prime minister of Pakistan;"

c.     "include[d] at least 33 people and companies blacklisted by the U.S. government because of evidence that they'd been involved in wrongdoing, such as doing business with Mexican drug lords, terrorist organizations like Hezbollah or rogue nations like North Korea and Iran;" and

d.     included "29 billionaires featured in Forbes Magazine's list of the world's 500 richest people."[7]

25.     It is hard to overstate the impact of the leak. On April 3, 2021, five years after the ICIJ and its partners began revealing the secrets of the Panama Papers, the ICIJ published an article on the significant developments that arose from the leak, including:

---

[5] *Id.*
[6] *Id.*
[7] *Id.*

a.      "Countries have recouped more than $1.36 billion in unpaid taxes, fines and penalties as a result of inquiries sparked by the Panama Papers;"

b.      "In the U.S., the Panama Papers helped persuade Congress to write and pass the Corporate Transparency Act, which requires owners of U.S. companies to disclose their identities to the Treasury Department. The legislation, the biggest revision of American anti-money laundering controls since the post-9/11 Patriot Act, was signed into law in January [2021];"

c.      "The government of Panama . . . signed a multilateral convention to share foreign taxpayers' information with other nations. New Zealand tightened its trust laws to prevent further abuses by foreigners attracted by the country's once pristine reputation. Since then, the number of so-called foreign trusts in New Zealand has plummeted 75%;"

d.      "In the United Kingdom, members of parliament repeatedly referenced the Panama Papers when passing legislation in 2017 that created the country's first criminal offense for lawyers who do not report clients' tax evasion;"

e.      "Iceland's prime minister, Sigmundur David Gunnlaugsson, resigned following nationwide protests after revelations that he and his wife owned a company in the British Virgin Islands;" and

f.      "In 2017, Pakistan's Supreme Court removed from office the country's longest-serving prime minister, Nawaz Sharif, as result of the Panama Papers' revelations about his family's properties overseas. A year later he was sentenced in the case to 10 years in prison on corruption charges and fined $10.6 million."[8]

---

[8] *Five years later, Panama Papers still having a big impact*, International Consortium of Investigative Journalists (Apr. 3, 2021), https://www.icij.org/investigations/panama-papers/.

26.     This assessment of the effects of the Panama Papers, five years on, was neither comprehensive nor final. The Panama Papers leak continues to influence world events today. In the wake of the war in Ukraine, for example, Germany reportedly has used the Panama Papers in its efforts to enforce sanctions against Russian oligarchs.[9]

**II.     Plaintiff decided to try to sell the Panama Papers to the German government.**

27.     Neither the ICIJ nor its partners paid Plaintiff for the Panama Papers. Plaintiff provided ICIJ journalists with the Panama Papers to expose a wide variety of crimes committed by Mossack Fonseca, its founders, employees, and clients, and to hold them accountable for those crimes.[10]

28.     Plaintiff, however, recognized the danger of exposing the powerful individuals named in the Panama Papers, telling Bastian Obermayer in 2015 that their "life [was] in danger, if [their] identity is revealed."[11]

29.     In late 2016, after journalists began publishing stories based on the Panama Papers, Plaintiff recognized that protecting themselves would require money. They also, deservedly, sought a portion of the tax proceeds that some governments would recoup as a result of the Panama Papers.

30.     Knowing that a market exists for leaked tax data, and knowing that the German government had paid in the past for data similar to the Panama Papers (although of a much smaller scope and value), Plaintiff decided in late 2016 to respond to an inquiry from the BKA.

---

[9] Georg Mascolo and Jörg Schumitt, *Wie Deutschland das Vermögen der Oligarchen aufspüren will* [*How Germany wants to track down oligarch fortunes*], Süddeutsche Zeitung (Mar. 11, 2022), https://www.sz.de/1.5545934/ ("The BKA has huge stocks of documents from tax havens, including the 2.6 terabytes of data from the 'Panama Papers', 'Offshore Leaks', 'Bahamas Leaks' and other data sets. So far, they have been used to search for German tax evaders. Now, according to government circles, it's about rich Russians." (translated from the German)).

[10] *See* John Doe, *The Revolution Will Be Digitized*, reproduced in *Panama Papers Source Offers Documents To Governments, Hints At More To Come*, International Consortium of Investigative Journalists (May 6, 2016).

[11] BASTIAN OBERMAYER & FREDERIK OBERMAIER, THE PANAMA PAPERS: BREAKING THE STORY OF HOW THE RICH & POWERFUL HIDE THEIR MONEY (June 30, 2016) [Prologue]

### III. **Plaintiff contacted the BKA from the United States to begin negotiations.**

31. On December 10, 2016, while in the United States, Plaintiff began exchanging messages over an encrypted messaging app with an agent from the BKA's money laundering unit ("Agent A"). At the outset, Plaintiff wrote, "I am willing to sell the entirety of the Panama Papers data so that it can be used by the BKA/NRW FV [North Rhine-Westphalia Finanzverwaltung (financial administration)] and other German government agencies and international partners, but of course safety is paramount." Agent A responded, in English, "If we work together we will confirm you *[sic]* that we'll keep your identity confidential."

32. Plaintiff and Agent A exchanged several messages in December, in which Agent A sought to verify the authenticity and value of Plaintiff's data and tried, multiple times, to convince Plaintiff to meet him in Germany. Plaintiff contemplated serious risk in traveling to Germany. Although Plaintiff had committed no crime, Plaintiff wrote, "For me going to Germany is risky. You are law enforcement and could arrest me on the spot." Agent A responded, "What would you prefer – and please consider – our – risk, because I neither wont *[sic]* to be arrested somewhere 😊 " Plaintiff was taken aback by the BKA's use of emojis.

33. While the plan to meet did not immediately coalesce, Plaintiff agreed to provide limited information on three companies of the BKA's selection to prove the bona fides of the data. On January 3, 2017, Plaintiff provided the sample data. That day, once again, Agent A tried to convince Plaintiff to come to Germany. Plaintiff indicated that it would not make a difference to negotiate in person, because Plaintiff would not provide a password to access the full Panama Papers "[u]ntil we have a contract . . . ." Plaintiff asked, "How long do you anticipate it would take to draft a contract?" Agent A did not answer the question.

34.     The next day, January 4, 2017, Plaintiff and Agent A began discussing a price for the Panama Papers. Plaintiff suggested "a percentage of the benefit to the government rather than a flat amount," explaining "[t]his is how the IRS whistleblower system works" and "I do not want to get rich off of this work unless the general public gets what it deserves back." But, Plaintiff proposed, "I would need some minimum amount so that I can at least stay safe . . . [s]o maybe $5 million minimum." Agent A responded, "So how about the idea of getting xmillion *[sic]* + tax revenue x%. . . . Should I start in your name the negotiation with 5 million US$ + x% participation in the tax revenue?" "If that sounds reasonable to you," Plaintiff replied, "I think that is a fair way to start."

35.     On January 6, 2017, Agent A wrote Plaintiff that the BKA had conducted "[f]irst checks and analysis" on the sample data and concluded that the data "is valuable for us." He then suggested starting an encrypted transfer, sending the data in ten separate transfers. Plaintiff responded, "I think there is too much still open-ended to start the transfer. But once a contract is signed I am willing to keep uploading encrypted volumes even before each stage of payment clears (because we will have a contract)." "There is no need for a contract concerning the data," Agent A replied, "because we will pay you bit by bit."

36.     On January 18, 2017, Agent A sent a letter in both German and English to Plaintiff signed by the vice-president of the BKA and stating:

> The laws of the Federal Republic of Germany oblige all authorities to protect persons, who have assisted the law enforcement / prosecution authorities in the execution of their tasks from threats to their lives, their physical safety, their freedom and other personal rights.
>
> Bearing this in mind the Bundeskriminalamt (Federal Criminal Police Office) promises to take all legal and necessary measures to ensure your safety and that of your family should the above rights be threatened as a consequence of your co-operation with the Bundeskriminalamt.

This includes a right of stay in Germany and subsequent protective measures.

The validity and scope of this undertaking must be reconsidered if you yourself reveal your identity and role in this matter, knowingly provide the Bundeskriminalamt with false information, make your information available to other authorities in Germany or abroad, or should you commit offences during the period of co-operation with the Bundeskriminalamt.

37.    On January 27, 2017, Agent A wrote to Plaintiff, that purchasing the Panama Papers had been "discussed on highest level *[sic]* of the German law enforcement administration with the vice-president of the BKA. The results are so far that Germany is highly interested in a cooperation concerning getting in possession of the data. The number you gave us is basically acceptable and realizable. However, the details about the amount of the money, the handling of the payment and the formal and administrative issues should be discussed later. . . . A final covenant won't be available before the end of next week."

38.    Plaintiff responded, "I don't know which number you are referring to that is acceptable." Agent A was unable to clarify what exactly the German government was offering.

## IV.    **Plaintiff traveled to Germany to negotiate in person, a process that the BKA dragged out for nearly five months.**

39.    On January 20, 2017, Donald Trump was sworn into office as President of the United States.

40.    Donald Trump and his businesses appear a number of times in the Panama Papers.

41.    Unable to discern a clear offer, let alone a draft contract, from the BKA, Plaintiff nonetheless took the risk of traveling to Germany, arriving on February 13, 2017.

42.    Plaintiff did not bring the Panama Papers with him to Germany, deliberately leaving them behind in the United States so that they could not be seized.

12

43.     Following directions the BKA provided over an encrypted app, Plaintiff met three BKA agents, who greeted Plaintiff, scanned Plaintiff and their belongings for listening devices, and then hustled Plaintiff into a black van (trailed by BKA agents in a Mercedes convertible) to be driven for hours to the first of three different safe houses.

44.     While in the van, Plaintiff's worst fears of the visit were nearly realized. After having Plaintiff complete basic paperwork for informants, within minutes, Agent A suggested that the German government charge Plaintiff with a fabricated small crime, because Germany's double jeopardy laws would prevent Plaintiff's extradition to a country like Panama or Russia. Plaintiff told the agents that being charged with a crime that Plaintiff did not commit was a terrible idea and a non-starter. The agents let the idea drop only after Plaintiff suggested that even a fake criminal record might one day prevent them from running for elected office.

45.     The next month was surreal. The two principal agents assigned to protect Plaintiff—Agent A and Agent W—made no concrete offer to purchase the Panama Papers and, instead, they spent most days taking Plaintiff to tour German cities and castles in the German countryside.  One particular destination unquestionably imperiled Plaintiff's safety, but Plaintiff felt as though he had no choice but to comply with the agents' suggestions. Nonetheless, Plaintiff insisted that they never visit a similar destination again.

46.     The agents first blamed the delay on slow German bureaucracy and then claimed that the BKA would need to evaluate the data before offering a percentage, despite the fact the BKA had already analyzed a sample of the data in January.

47.     These excuses were disingenuous. As Plaintiff pointed out to the agents, if the data was worthless, Plaintiff's percentage would be worthless as well.

48.     The BKA's decision to withhold a straightforward offer—as Plaintiff wasted days taking in one castle after another, or otherwise counting the hours alone in the safe houses—was a negotiating strategy meant to wear down Plaintiff until Plaintiff agreed to a lower percentage of future tax revenues.

49.     On March 8, 2017, the BKA requested that Plaintiff deliver the data in eight parts for which Plaintiff would be paid €625,000 each at the time of delivery (for a total of €5 million). The BKA did not offer a percentage of future recoveries but, on March 15, 2017, Agent A said that the BKA was considering offering 3%. Plaintiff said this percentage was unacceptable, noting that the IRS whistleblower program pays 15-30% for recoveries from successful whistleblower tips, with 30% standard for exceptionally valuable tips.

50.     Instead, Plaintiff agreed to receive an initial payment of €625,000 for approximately one eighth of the data, to allow the German government an opportunity to further examine the data and determine if it wanted to purchase the remainder.

51.     The BKA determined the €625,000 would be paid into an account held under a fictitious name at a local bank ("local bank X account"). The BKA controlled the account but eventually provided Plaintiff with a bank debit card to withdraw money at ATMs. The BKA imposed a daily withdrawal limit of €600, which Plaintiff never agreed to as it would have taken Plaintiff nearly three years of daily withdrawals to fully access the funds in the account at that time. At the time, Plaintiff believed that the funds could be transferred via other means, however.

52.     Plaintiff then arranged and paid for the encrypted hard drive containing the Panama Papers data to be shipped from a false identity in the United States to a different false identity used by the BKA at an address in Germany.

53.     The BKA received the hard drive successfully, allowing Plaintiff to begin working on preparing the first eighth of the data to the BKA's specifications.

54.     After receiving the data as requested, the BKA falsely accused Plaintiff of fraud because the BKA's money laundering specialist did not understand the basic mathematical principles underlying his own request. After patiently explaining the situation to Agent W, the BKA retracted its false accusation and agreed that Plaintiff had honored the agreement perfectly.

55.     On March 20, 2017, the same money laundering specialist visited Plaintiff in the safe house with Agents A and W.  When discussing the payment percentage, he suddenly turned irate, lost his temper, and screamed at Plaintiff in a manner that was intimidating. Plaintiff responded calmly, but the message was not lost on Plaintiff that any guarantees of safety by the BKA were meaningless.

56.     Later on March 20, 2017, Plaintiff agreed that the initial payment could be made into the local bank X account as long as the funds could be transferred to a United States financial institution. The second agent assigned to Plaintiff, Agent W, said that Plaintiff could not transfer the funds directly from the account to the United States (without explaining why this was the case) and left resolving that issue for the future.

57.     At a restaurant on March 27, 2017—more than a month after Plaintiff arrived in Germany and more than four months after Plaintiff began negotiating with the BKA—Agents A and W verbally relayed an offer authorized by the BKA's vice-president. Since the BKA did not commit the offer to writing, the agents had difficulty conveying the offer with clarity, often contradicting themselves as Plaintiff asked clarifying questions. Nonetheless, Plaintiff understood the offer to be that the BKA would pay €5 million for the Panama Papers. Plaintiff would deliver the papers in eight segments, purchased with eight separate payments of €625,000.

In addition, the German government would pay Plaintiff 5% of any amount collected on, at least, the first segment of data, as long as the amount collected exceeded €625,000. (The percentage to be paid on recoveries from the additional data segments remained unspecified.) Finally, the German government would include in the calculation of proceeds subject to Plaintiff's percentage any amounts paid by other countries to the German government for access to the Panama Papers.

58.     The night of March 27, 2017, since the BKA refused to commit anything about its offer to writing, Plaintiff set about drafting a memorandum of understanding ("MOU") to avoid future misunderstandings. Among other things, the MOU provided that the percentage for recovery would be 5% for the first segment, but "[s]hould the BKA decide to continue to acquire Segments 2 through 8, the parties will at such time negotiate a new Rate **in excess of 5%** to apply to all Segments **retroactively**" (emphasis in original). Plaintiff transmitted the MOU to Agents A and W electronically.

59.     The next day, March 28, 2017, Agents A and W arrived at the safehouse with the MOU printed. While they praised the professionalism with which the MOU was drafted—proclaiming it "very high quality, almost German level"—no one from the BKA had signed the document.  Nonetheless, by the end of the day, an agreement had been reached.

60.     On March 29, 2017, Plaintiff delivered the first segment of data to the BKA. Plaintiff copied only the specific data agreed upon from Plaintiff's hard drive, which had been shipped from the United States, to a new, empty hard drive provided by the BKA. In this manner, Plaintiff retained control over the remaining data.

61.     On April 4, 2017, €625,000 appeared in the local bank X account in payment for the segment.

62.     In April, Plaintiff asked Agent A for advice on how to transfer the funds in the local bank X account to the United States. Agent A suggested that Plaintiff open an account at an international bank.

63.     On April 24, 2017, Plaintiff informed Agent A that he intended to open an account at a specific international bank. Since Agent A did not object, Plaintiff opened an account at the international bank (the "international bank Y account").

64.     Plaintiff could not, however, transfer the funds in the local bank X account to the international bank Y account because the BKA refused to give Plaintiff the Transaction Authentication Number (TAN) necessary for such a transfer. TANs are one-time codes that are standard security measures on many European bank accounts.

65.     Plaintiff registered his discontent at the fact that the BKA appeared to be withholding access to Plaintiff's funds. Plaintiff then spent two months waiting in safe houses for the BKA to decide if it wanted to purchase the additional data segments, and for the BKA to make a serious offer on the percentage to be paid on recoveries from the remaining data.

66.     At one point, the BKA summarily informed Plaintiff that it would no longer pay the rent on the safe house they were staying in. Thus, Plaintiff was required to begin reimbursing the BKA for a measure taken to ensure Plaintiff's own safety that the BKA had previously guaranteed. The funds were withdrawn from the local bank X account that Plaintiff could only access via debit card.

67.     When Plaintiff moved to the next safe house—a location that jeopardized Plaintiff's safety for a number of reasons, including but not limited to a lack of functioning internet access—Plaintiff was required to reimburse the BKA for that location's rent, as well.

68.     While Plaintiff was waiting, representatives of the various German state finance ministries met with the BKA to determine how to split the cost and responsibility of investigating the criminal acts described by the Panama Papers data. The Hessian finance ministry, which reportedly contributed €300,000, was chosen to lead the states' investigative efforts in conjunction with the newly-formed "Olet" team at the BKA. The BKA's Olet team was based in Wiesbaden, where the BKA money laundering specialist also worked. A team in Kassel in the state of Hessen handled law enforcement inquiries from within Germany regarding the data. Both purported to have technical expertise that would be necessary to assess the data.

69.     It was not until June 12, 2017, that the BKA made an offer to purchase the remaining data: 7% of all collections based on the Panama Papers. Plaintiff counteroffered at either 12% of all collections *or* 10% insured by a guaranteed payment of €10 million (in case the German government was unable to collect more than €100 million).

70.     On June 14, 2017, Agent A and another BKA agent, Agent R, met with Plaintiff to convey that the night before there had been a long meeting at the BKA, and a decision was made to offer Plaintiff a €5 million fixed payment plus 10% of future recoveries. Plaintiff pointed out that there was nothing in writing to confirm the agreement if the German government failed to "remember" the deal. Agent A responded that the BKA does not provide its informants with anything signed, saying only that "[i]t comes down to trust."

71.     This was obviously false. The BKA created signed written documents and provided them to Plaintiff before Plaintiff even arrived in Germany.

72.     Five days later, on June 19, 2017, however, Agents A, W, and R indicated that the BKA would approve putting the agreement in writing, but would not commit to providing a

signed agreement. Plaintiff informed the agents that there would be an agreement only if Plaintiff could ultimately receive the funds in the United States.

73.    On June 23, 2017, Agents A and R met with Plaintiff and said that the vice-president of the BKA had agreed to three points: the €5 million initial payment, a 10% payment on future collections based on the Panama Papers above €50 million, and a paper saying that Plaintiff has the right to request an accounting of collections every year. The agents then provided Plaintiff with two equivalent letters in German and English, attached as Exhibit 1, on BKA stationary bearing Vice-President Peter Henzler's name and his signature only on the German version. In English, the letter read:

> Dear Sir,
>
> The Bundeskriminalamt pays a share of 10 per cent *[sic]* for funds derived from criminal activities/fiscal offences which have been confiscated with final and binding effect and exceed EUR 50,000,000 (in words: fifty million EUR).
> This applies if there was a causal relationship between the documents and the confiscation.
>
> Upon your request, you will receive a list of the funds confiscated with final and binding effect once a year as from 2018.
>
> Please treat the information contained in this letter in confidence.
> In Vertretung [In representation]
>
>
> Henzler
> Vizepräsident [Vice-President]

74.    The letter did not mention the €5 million initial payment, because that was to be paid before Plaintiff provided the BKA with a password to access the Panama Papers.

75.    Plaintiff agreed to the terms in the letter and provided the agents with a new encrypted hard drive containing the Panama Papers, but not the password to access the data.

76.     On June 29, 2017, €4,375,000 appeared in the local bank X account. This amount represented the €5 million initial payment minus the €625,000 payment already made in March for the first segment of data.

77.     At this point, Plaintiff provided the agents with the password to decrypt the data.

78.     On July 4, 2017, the German government announced that it had purchased the Panama Papers.[12] Someone in the government leaked that it had paid €5 million.[13]

79.     Agent A joked with Plaintiff that the millions of Euros in taxes Plaintiff had just paid, already deducted from the gross payment amount, were more money than he had ever seen, but did not give Plaintiff a written record of the transaction.

80.     In August 2017, increasingly concerned for their safety, Plaintiff returned to the United States.

81.     In 2019, the BKA failed to prevent the Russian government-backed murder of Zelimkhan Khangoshvili in broad daylight in a Berlin park.

**V.     The BKA and Plaintiff arranged to transfer the funds to the United States.**

82.     Once in the United States, John Doe had no access to the funds at local bank X, which remained in an account under a false name and under the control of the BKA.

83.     Plaintiff could log into the local bank X account online and see the funds but, without a TAN, could neither send a wire transfer to the United States, nor get the bank card the BKA provided to work in the United States. (Several attempts to use the card at U.S. ATMs resulted only in error messages.)

---

[12] Press Release, BUNDESKRIMINALAMT, *Auswertung der sogenannten "Panama Papers"* [*Evaluation of the so-called "Panama Papers"*], (July 4, 2017), https://www.bka.de/DE/Presse/Listenseite_Pressemitteilungen/2017/Presse2017/170704_PanamaPapers html?nn=67356.
[13] *See, e.g.*, *Panama Papers: Germany 'pays millions' for leaked data*, BBC (Jul. 5, 2017), https://www.bbc.com/news/world-latin-america-40505300 (The BKA "did not confirm the sum, but government sources told German media 5m euros (£4.4m; $5.7m) had been paid.").

84.     In late July and early August 2017, BKA agents proposed numerous ill-conceived options for moving the money to the United States, including the structuring of the payment as a gift to Plaintiff from then-German Chancellor Angela Merkel or as the proceeds of a winning ticket in the German lottery. Eventually, the agents proposed that the BKA create a German partnership to transfer the funds to a company controlled by Plaintiff. Subsequently, however, the BKA backed away from this idea.

85.     Fed up with the BKA's delays, unworkable ideas, and last-minute backtracking, on August 11, 2017, Plaintiff asked Agent A to wire the funds directly to an account that Plaintiff controlled in the United States.

86.     On August 14, 2017, having received no commitment from Agent A to send the requested wires, Plaintiff wrote Agent A, "What exactly is stopping you from sending a wire transfer at this point? You have the data, it's my money . . . ." Agent A responded that the "bosses" would need to determine if it was legal "to do the wire transfer to the US."  To which Plaintiff replied, "You knew I was American in December last year. Now it's time to actually follow through."

87.     On August 21, 2017, Plaintiff called Agent A and provided details of their international bank Y account. Plaintiff asked for the BKA to transfer the funds from the BKA's local bank X account to Plaintiff's international bank Y account, so that Plaintiff could then wire the funds to Plaintiff's account in the United States.

88.     On August 25, 2017, Agent A informed Plaintiff that the BKA would transfer the funds to Plaintiff's international bank Y account, knowing that Plaintiff intended to transfer the funds from the international bank Y account to an account in the United States.

89.     Nevertheless, on August 28, 2017, Agent A wrote Plaintiff wondering if Plaintiff still "insist[ed] on a wire-transfer on the [international bank Y] account." Exasperated by the BKA's foot-dragging, Plaintiff responded, "If I do not have the money in my [international bank Y] account by tomorrow I am going to the press."

90.     On August 29, 2017, the BKA transferred the funds (approximately €5 million) from the local bank X account to the international bank Y account.

91.     The next day, August 30, 2017, Plaintiff requested that international bank Y send the first of three wire transfers to Plaintiff in the United States.

92.     In early September 2017, the first of three wire transfers arrived in one of Plaintiff's accounts in the United States from the international bank Y account. In mid-September 2017, the second wire transfer arrived in the United States. In 2018, the third wire transfer arrived in the United States with the remainder of the funds.

**VI.    The German government has collected over $195 million in taxes and penalties as a result of the Panama Papers but has not provided Plaintiff with a percentage of those recoveries, in breach of the BKA's agreement with Plaintiff.**

93.     In late 2018, in accordance with the June 23, 2017, agreement, Plaintiff asked Agent W to provide a list of the funds confiscated by the German government where there was a causal relationship between the documents and the confiscation. On September 10, 2018, Agent W responded, "Due to criminal/- and tax proceedings, funds of 5.500.000 Euro have been collected so far. If the agreed sum of 50.000.000 Euro should be reached, which would justify another payment, we will contact you again." No list was provided.

94.     On September 21, 2018, the BKA issued a press release announcing that it had shared Panama Papers data with 17 European countries. It also announced the receipt of 70 police requests from countries other than Germany.[14]

95.     On August 22, 2019, Plaintiff once again requested an accounting of funds collected by the German government. Agent W responded the same day: "Due to criminal/- and tax proceedings, funds of 9.100.00 *[sic]* Euro have been collected till today. So we are still fare *[sic]* away from the amount of 50.000.000 Euro, which would justify another payment. If this amount will be reached we contact you again. *[sic]*"

96.     In December 2019, Deutsche Bank announced that it had agreed to pay €15 million to end a probe by the Frankfurt prosecutor's office into possible money laundering and tax evasion involving German clients of the bank. According to *The Wall Street Journal*, "Deutsche Bank and prosecutors both confirmed . . . that the investigation was related to the Panama Papers."[15]

97.     From approximately 2019 through present day, different German states have issued vague and often conflicting press releases regarding their success at collecting taxes and fines due to the Panama Papers. At arbitrary intervals, different announcements have been issued by the finance ministries of Baden-Württemberg, Schleswig-Holstein, and Hessen, the lead German state for the effort. Other states have collected millions of Euros but have issued no

---

[14] Press Release, BUNDESKRIMINALAMT, *„Panama Papers" - BKA fördert Auswertung auf EU-Ebene* [*"Panama Papers" - BKA promotes evaluation at EU level*], (September 21, 2018), https://www.bka.de/DE/Presse/Listenseite_Pressemitteilungen/2018/Presse2018/180921_AuswertungPanamaPapers.html.

[15] Jenny Strasburg, *Deutsche Bank Agrees to Pay €15 Million in Money-Laundering Probe*, The Wall Street Journal (Dec. 6, 2019), https://www.wsj.com/articles/deutsche-bank-agrees-to-pay-15-million-in-money-laundering-probe-11575652361; *see also Deutsche Bank pays €15m in money laundering settlement*, Financial Times (Dec. 6, 2019), https://www.ft.com/content/eeefa806-184b-11ea-9ee4-11f260415385 ("The now-dropped criminal probe zeroed in on a small BVI-based subsidiary of Deutsche called Regula that came to attention in the so-called Panama Papers, a huge leak of private documents from a Panamanian law firm exposing a web of secret offshore companies."); *Deutsche Bank headquarters raided in case connected to Panama Papers*, Washington Post (Nov. 29, 2018), https://www.washingtonpost.com/business/2018/11/29/deutsche-bank-headquarters-raided-case-connected-panama-papers/.

public statement to that effect.  Notably, no public announcement from the state of Nordrhein-Westphalen (North Rhine Westphalia) has been made despite that state's documented history of aggressively enforcing the law based upon its own purchases of leaked tax data.

98.     On February 16, 2021, the finance minister for the German state of Hessen, Michael Boddenberg, released a public statement summarizing the results of an evaluation of the effect of the Panama Papers undertaken by the BKA and the Hessian Tax Administration. According to Minister Boddenberg, various German authorities "were asked to report" data on the effect of the Panama Papers to the central team located in Kassel. He noted, however, that "there is no obligation to report the results to the evaluation team in Kassel" and opined that, as a result, collections attributable to the Panama Papers "so far are actually much higher" than the amounts found by the Kassel team. Nonetheless, Minister Boddenberg reported:

> From the responses received, the following picture emerges nationwide so far:
>
> - Additional tax result: over 38.4 million euros.
> - Additional result under criminal law: over 19 million euros

The same press release stated "In total, this leads to a demonstrably centrally recorded multiple result of around 72 million euros."[16]

99.     Yet, on March 25, 2021, Agent W wrote Plaintiff that "the sum that is causally and exclusively attributable to the 'Panama Papers' is currently well below 20 million euros."

100.    When negotiating the terms of sale, Plaintiff insisted on, and was granted, the right to at least an annual detailed accounting of progress made by German authorities precisely in order to avoid the bureaucratic chaos and opacity associated with tracking each German state's work.

---

[16] Press Release, Hessian Ministry of Finance, *Auswertung der Panama Papers erfolgreich abgeschlossen* [*Evaluation of the Panama Papers successfully completed*] (Feb. 16, 2021), https://hessen.de/presse/auswertung-der-panama-papers-erfolgreich-abgeschlossen (translated from the German).

101.    On April 6, 2021, the ICIJ reported that Germany had reclaimed $195.65 million in back taxes and penalties as a result of the Panama Papers.[17] The ICIJ's report stated, "ICIJ's total counts only the recovered funds that we can verify through official responses from governments."[18]

102.    On April 9, 2021, for the first time, the BKA provided Plaintiff with part of a "list of the funds confiscated." The partial list, compiled by the same money laundering specialist who lost his temper at Plaintiff, was highly redacted and detailed a total purportedly under the €50 million threshold, listing only €13.5 million as the amount recovered. According to Agent W, the list only included recoveries based "exclusively" on the data from the Panama Papers.

103.    In the same message, in stark contrast to the years of public boasting by the BKA and German state authorities, Agent W conveyed the message that the BKA considered the Panama Papers collections "rather disappointing."

104.    On September 15, 2021, Agent W informed Plaintiff that he had retired and provided a number at which the BKA could be reached via encrypted messaging app.

105.    Plaintiff attempted to contact the number provided by Agent W several times in September and November 2021 to discuss tax collections attributable to the Panama Papers and any additional amounts owed to Plaintiff but received no response until, on February 15, 2022, an unknown individual briefly responded.

106.    On April 4, 2022, in a message to Plaintiff, a new agent, Agent M, stated that the BKA's computation of the total recovery from the Panama Papers only counted money that was "causally and exclusively attributable to the 'Panama Papers.'"

---

[17] Sean McGoey, *Panama Papers revenue recovery reaches $1.36 billion as investigations continue*, International Consortium of Investigative Journalists (Apr. 6, 2021), https://www.icij.org/investigations/panama-papers/panama-papers-revenue-recovery-reaches-1-36-billion-as-investigations-continue/.
[18] *Id.*

107.     Plaintiff and the BKA never restricted Plaintiff's percentage claim on future recoveries to only those derived "exclusively" from the Panama Papers. The June 23, 2017, agreement specifically required only "a causal relationship between the documents and the confiscation." This is due to the nature of investigations involving offshore companies, in which the masked ownership of a company is typically the one missing puzzle piece that conclusively solves the case when finally placed into the context of the larger puzzle. Aside from being fabricated to evade compliance with its contract, the BKA's exclusivity term is therefore also nonsensical.

108.     Plaintiff and the BKA also agreed that to ensure compliance, Plaintiff was entitled to a detailed annual accounting of collections, which necessarily *required* feedback from various German federal and state authorities to the Kassel team and/or the BKA Olet team regarding such collections.   Minister Boddenberg's 2021 statement that feedback was optional was an admission that the German government had violated its contract with Plaintiff.

109.     Accordingly, the German government and its agent, the BKA, breached their agreement with Plaintiff and owe Plaintiff 10% of recoveries by any German federal or state body above €50 million causally related to the Panama Papers plus 10% of any payments by foreign governments to Germany for providing any portion of the Panama Papers.

110.     In her April 4, 2022, message, Agent M stated, "Please be aware that in case you will file a lawsuit this may consequently mean it's not possible to keep your identity secret anymore. In Germany anonymous lawsuits aren't possible." Plaintiff understood the implied threat: Proceed at your own peril.

## CLAIM I
### (Breach of Contract - All Defendants)

111.    Plaintiff incorporates the foregoing paragraphs by reference as if fully set forth herein.

112.    In 2017, Plaintiff and Defendants (through Defendant BKA) entered into a valid and binding contract for the sale of information from the United States in exchange for money, as described above. The contract required Defendant BKA to make payments to Plaintiff that it knew would ultimately reach the United States. Defendant BKA, in fact, made payments to Plaintiff that Defendant BKA intended to reach Plaintiff in the United States and that it helped to reach Plaintiff in the United States.

113.    The BKA's actions caused a physical hard drive containing the Panama Papers to be shipped to Germany from the United States at Plaintiff's expense in order to facilitate a commercial transaction.

114.    Accordingly, Defendants waived their sovereign immunity by implication and committed acts outside the territory of the United States in connection with commercial activity of the Defendants elsewhere that caused a direct effect in the United States.

115.    As set forth in the June 23, 2017, letter from its vice-president to Plaintiff, Defendant BKA had, and continues to have, a duty to pay Plaintiff 10% of all "funds derived from criminal activities/fiscal offences which have been confiscated with final and binding effect and exceed EUR 50,000,000 (in words: fifty million EUR)" as long as there was "a causal relationship" between the Panama Papers and the recovered funds.

116.    Defendant BKA breached, and continues to breach, its contractual duty by failing to pay Plaintiff any percentage of funds derived from criminal and civil enforcement actions

causally related to the Panama Papers, above the first €50 million in collections, despite collecting over $195 million in taxes and penalties alone as of April 2021.

117.    As set forth in the June 23, 2017, letter from its vice-president to Plaintiff, Defendant BKA had, and continues to have, a duty to, upon Plaintiff's request, "provide a list of the funds confiscated with final and binding effect once a year as from 2018." On April 9, 2022, Defendant BKA further breached its contractual duty by providing Plaintiff with an inaccurate list of the funds confiscated with final and binding effect.

118.    Accordingly, Defendants owe Plaintiff at least $14,565,000 after taxes, plus interest.

### CLAIM II
### (Violation of the Implied Covenant of Good Faith and Fair Dealing - All Defendants)

119.    Plaintiff incorporates the foregoing paragraphs by reference as if fully set forth herein.

120.    Defendant BKA violated the implied covenant that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract when Defendant BKA, in bad faith and arbitrarily and capriciously:

     a.  attempted unilaterally to add a term to the contract that would prevent Plaintiff from receiving the money owed by Defendants; and

     b.  implicitly threatened Plaintiff's anonymity when it reiterated its fabricated exclusivity term and stated that Plaintiff had no legal recourse in Germany that would allow Plaintiff to maintain anonymity.

121.    Had Plaintiff known that there was any kind of exclusivity term implied in the BKA's interpretation of the agreement, Plaintiff would never have agreed to the 10% figure regarding collections, penalties, interest, fines, and related income.

122.    These actions evaded the spirit of the contract, willfully rendered imperfect performance by Defendants, and destroyed and injured Plaintiff's right to receive the fruits of the contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.  Compensatory damages of, at least, $14,565,000 and equal to ten percent (10%) of Defendants' past collections causally related to the Panama Papers of taxes due and owing, tax penalties, interest on taxes due and owing, criminal fines, and collections derived from other fiscal offenses plus any amounts paid to the German government or its constituent states by other countries related to the German government's provision of the Panama Papers;

B.  Pre-judgement and post-judgment interest;

C.  Declaratory relief that Defendants will provide an annual accounting of all relevant collections causally related to the Panama Papers beginning shortly after judgment and in the future for as long as Defendants continue to collect;

D.  Declaratory relief that Defendants must, in the future, pay Plaintiff ten percent (10%) of Defendants' collections causally related to the Panama Papers of taxes due and owing, tax penalties, interest on taxes due and owing, criminal fines, and collections derived from other fiscal offenses plus any amounts paid to the German government or its

constituent states by other countries related to the German government's provision of the

Panama Papers;

E.   Punitive damages; and

F.   Further relief as this Court deems just and proper.

Dated: June 20, 2023

                    Respectfully Submitted,

                    /s/John Doe_____
                    John Doe
                    doevgermanylitigation@protonmail.com